**Etta Potson BODOGLAU, Administratrix of the Estate of Michael Potson, Deceased, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 11495.**

United States Court of Appeals Seventh Circuit.

Feb. 29, 1956.

---

7. Cf. Carpenter v. Longan, 16 Wall. 271–277, 21 L.Ed. 313.

Llewellyn A. Luce, Walter H. Maloney, Washington, D. C., for petitioner.

H. Brian Holland, Asst. Atty. Gen., Elmer J. Kelsey, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., Ellis N. Slack, Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

DUFFY, Chief Judge.

This is an appeal from a decision of the Tax Court (22 T.C. 912) which determined that there were deficiencies in taxpayer's income and victory tax for the calendar years 1936, 1941, 1942 and 1943, and deficiencies in fraud penalties for each of such years, and also for the year 1940. In this case the income of taxpayer was determined by the use of increase in net worth plus nondeductible expenditures method.

The Tax Court reduced the deficiencies and penalties as determined by the Commissioner from an aggregate of $255,-981.30 to $151,561.85, with a corresponding reduction in the 50% penalties. The Tax Court held that the Commissioner's position was "unrealistic", particularly with reference to the determination that the taxpayer had only $15.03 cash on hand and in the bank on December 31, 1935, the beginning of the net worth period. The Tax Court found that $100,-000 was the proper figure.

Taxpayer came to Chicago in 1904. He acquired property in 1905 in the area then known as the "vice district." He operated a poolroom and a restaurant. He leased part of the premises where a saloon and house of prostitution were operated, until the "district" was closed in 1912. He moved to Gary in 1915 and until 1918 operated a restaurant in connection with which gambling was conducted. The Tax Court found taxpayer was successful in all these business ventures.

In 1919, taxpayer purchased from James Colosimo a half interest in a restaurant and night club in Chicago known as "Colosimo's." In 1920 Colosimo was murdered and thereafter taxpayer acquired the interest of his deceased partner. He operated the busi-

ness as a sole proprietor until 1928 when it was closed by city officials. A corporation, "Colosimo's Restaurant, Incorporated" in which taxpayer owned all the capital stock, resumed operation in 1929. The club was closed in 1933 due to a violation of the National Prohibition Act, 27 U.S.C.A. Taxpayer again operated Colosimo's as a sole proprietorship in 1934, and until June 30, 1935, conducting same in the name of one of his employees. Beginning about July 9, 1935, and continuing through the taxable years, taxpayer operated Colosimo's under the name of "2126 South Wabash Restaurant Corporation." The corporation began its operations with capital of about $7,000. In 1936 taxpayer extensively remodelled and enlarged Colosimo's so that it became an elaborate and highly successful night club which was patronized by many prominent persons.

During the taxable years the corporation used a single entry system of bookkeeping. The basis of the system was the recording and totaling of sales and expenses on the cash register. The Tax Court found that on some occasions, when there had been a particularly heavy volume of business, such as New Year's Eve, the cash register was "cleared," and a predetermined amount less than the actual amount of receipts was recorded thereon. The difference in cash was removed by the taxpayer. The corporation did not maintain a general journal or a general ledger. Inventories were not used in computing cost of goods sold. Disbursements made for business expenses of the corporation and those made for the personal expenses of the taxpayer were not kept separate. The Tax Court found that the corporation records were insufficient to form the basis for an accurate determination of its income or

the income which taxpayer derived from Colosimo's.

During the taxable years, there were "crap games" at Colosimo's three nights a week, and poker games about two nights a week. Such games were not open to the public generally, but were participated in by entertainers, the taxpayer and some of taxpayer's personal friends. In addition to participating in these games, taxpayer or Colosimo's received a "rake-off" on all these games. Taxpayer also operated a "handbook" for placing bets on horse races. The Tax Court found these games and handbook operations were a source of income during the taxable years.

Taxpayer frequently gambled in places other than at Colosimo's. He gambled with certain persons connected with the motion picture industry, and in the entertainment field, and won considerable sums from them. In August, 1940, taxpayer purchased a residence in Beverly Hills, California, for which he paid $26,750. In 1943 he purchased a building on Santa Monica Boulevard, Beverly Hills, California, for $71,997.64. He paid $62,647.58 toward the cost of the property, and executed a mortgage note for $9,350.06. His annual income from this property was approximately $12,000.

On August 28, 1939, taxpayer organized the Harrison and State Building Corporation, as a real estate holding and rental corporation. Ninety-one of the one hundred shares of capital stock were issued to Etta Smith, a name used by Rose Potson whom the Tax Court found to be the wife of taxpayer.

Taxpayer purchased four pieces of Chicago real estate taking title in the name of Harrison and State Building Corporation, as follows:

September, 1939, 624–630 South State Street, purchase price ............................... $16,311.20;

November, 1939, 632–638 South State Street, purchase price ............................... 18,375.31;

July, 1940, 629–639 North Clark Street, purchase price ..................................... 39,169.66;

In 1940, 2001–2011, and 2000–2004 West Madison Street, purchase price ....................... 30,479.69.

All of these properties were owned by the corporation on December 31, 1943.

The Building Corporation executed and delivered to taxpayer "mortgage notes" aggregating $82,500, payable to bearer and secured by trust deeds on some of the property above described. The Tax Court found taxpayer never made any loans to the Building Corporation, but caused the Corporation to issue such notes to him to protect his interest in the property in view of the fact that although he was the true owner of the stock, other persons were the stockholders of record.

During the fiscal years ending August 31, 1940 to August 31, 1943, inclusive, no formal dividends were declared by the Harrison and State Building Corporation. However, during the taxable years in question the Corporation made certain payments to taxpayer on some of the previously described mortgage notes. On February 19, 1944, taxpayer submitted a financial statement signed by him to the California Bank, Beverly Hills, California, in which it was represented that the annual income from 2126 South Wabash Avenue (Colosimo's) was $40,000. This statement showed his net worth to be $377,300.

Prior to 1907 Rose Potson's maximum earnings were $7.00 per week. After meeting taxpayer she became connected with the operation of two small hotels in the "district." She ceased such operation in 1912, and from 1913 to 1936 Rose Potson was not engaged in any business and was not employed. From 1936 to 1943 she filed federal income tax returns reporting income from the cigarette, flower and hatcheck concessions at Colosimo's. The tax shown to be due on such returns was paid by taxpayer. Neither Rose Potson nor taxpayer ever inherited any property.

Taxpayer was convicted of knowingly attempting to defeat and evade a large part of the income tax due from him for the taxable years 1940 to 1943, inclu-

sive.[1] The judgment of conviction was affirmed by this Court. United States v. Potson, 7 Cir., 171 F.2d 495. Taxpayer claims the evidence in this case is different in numerous respects than the evidence in the criminal case. In the instant case it was stipulated that taxpayer sustained the following losses from gambling: 1940—$1,758.55; 1941 —$7,241.25; 1942—$19,300.00; and 1943—$3,500.00. The Tax Court found taxpayer had net income for the taxable years in question as follows: 1936— $34,326.79; 1941—$94,941.68; 1942— $44,088.81; and 1943—$115,335.00.

On this appeal taxpayer contends there was no necessity of using the net worth expenditure method of computing his income, but having done so the Tax Court was in error in determining items such as gambling losses and his advances to 2126 South Wabash Restaurant Company as income to him. He also complains because the Tax Court did not believe Mrs. Potson's story that from 1939 to 1943 she contributed from her own funds some $62,000 toward the purchase of real estate and some $11,000 in the purchase of United States bonds.

We think the Commissioner was justified under Section 41 of the Internal Revenue Code, 26 U.S.C.A. § 41, in resorting to the net worth expenditure method to determine the taxpayer's corrected net income. The Supreme Court has approved that method of proof in criminal cases. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L. Ed. 150; Friedberg v. United States, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188; United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202. It follows that in appropriate situations the same method may be used in civil cases. Thomas v. Commissioner of Internal Revenue, 6 Cir., 223 F.2d 83; Marcella v. Commissioner of Internal Revenue, 8 Cir., 222 F.2d 878. In the case at bar the evidence disclosed that Colosimo's was a main source of income for tax-

---

1. Almost the entire transcript of that trial was received in evidence as a joint exhibit in this case.

payer, and that part of the actual receipts of that business had been diverted and did not appear in its books or records. Furthermore, such books and records as were kept were entirely inadequate to disclose the correct amount of income.

The Commissioner determined that on December 31, 1935 taxpayer had cash on hand and in the bank in the sum of $15.03. This was the balance shown in taxpayer's bank account on that date. Apparently the account was inactive, as the same balance appears for the years 1936 and 1937. However, the Tax Court thought this was an unrealistic approach and took into consideration that starting in 1904 taxpayer kept cash in a number of safe deposit boxes. Considering all the evidence in the case the Tax Court determined that taxpayer actually possessed $100,000 in cash on the critical date of December 31, 1935. Taxpayer testified and plaintiff now insists he had at least $259,000 cash [2] in his possession on that date and argues the Commissioner did not rebut that testimony. Mrs. Potson's testimony corroborated, in some degree, that given by her husband, but the Tax Court, after having observed them on the witness stand, did not have confidence in the truthfulness of their testimony. The Tax Court said " * * * and it is our conclusion that both of them were careless with the truth. Our findings in many instances reflect our lack of confidence in their credibility."

In reaching a determination of the correct amount of cash on hand on December 31, 1935, the Tax Court was justified in considering other evidence in the case such as the financial statement submitted to a Chicago bank on June 30, 1930, which showed taxpayer then had on hand $16,195.47 in cash and notes receivable; that in 1936 he apparently used $16,000 in cash to refurbish Colosimo's, and in the same year paid $5,600 in currency on the purchase price of real estate at 2124 South Wabash Avenue. Other evidence in this connection is that taxpayer testified he had approximately $215,000 in a safe deposit box on September 2, 1927. Yet, on that same day, he borrowed $26,400 from one Moses Samuels. As security, taxpayer executed a mortgage on three of his properties. The first three installments were paid when due, but the taxpayer only paid $750 of the total payment of $15,600 which was due on September 2, 1932. The due date on the remaining balance of $14,850 was extended three years to September 22, 1935, but the taxpayer failed to make payment on that date, and the indebtedness was not liquidated until April 30, 1936. Again, taxpayer testified that on December 11, 1928 he had "maybe $140,000 or $150,000 cash." Yet, on that day he borrowed $23,000 to be repaid over a period of three years.

We think the Tax Court was generous to taxpayer in fixing $100,000 as the amount of cash on hand at the beginning of the net worth period, but under the Cohan rule [3] such determination was proper. It is the function of the trier of the fact to weigh all the elements properly considered in the valuation and to translate them into dollars and cents. Commissioner of Internal Revenue v. Thompson, 3 Cir., 222 F.2d 893, 895; Colonial Fabrics, Inc., v. Commissioner of Internal Revenue, 2 Cir., 202 F.2d 105, 107. Nor is it essential that there be testimony of the specific figure fixed by the Tax Court. Burford-Toothaker Tractor Co. v. Commissioner of Internal Revenue, 5 Cir., 192 F.2d 633, 635. We approve of the Tax Court's

2. The $259,000 allegedly comprised money kept in two safe deposit boxes plus $50,000 which taxpayer claimed he gave his wife to ransom him in the event he were kidnapped.

3. The rule established in Cohan v. Commissioner of Internal Revenue, 2 Cir., 39 F.2d 540, 543–544 lays down the principle that where some deduction is clearly warranted but its exact amount cannot be ascertained, the Commissioner shall make the best estimate he can. Boston & M. R. R. v. Commissioner of Internal Revenue, 1 Cir., 206 F.2d 617, 624.

finding that on December 31, 1935, taxpayer had $100,000 cash in his possession.

■ Considering now taxpayer's complaint as to the manner in which his gambling losses were handled, he apparently contends that gambling losses can only be considered in connection with gambling gains. True, if the net income of taxpayer had been determined by direct proof, losses would be allowed only to the extent of gains under Section 23(h) Internal Revenue Code of 1939. However, under the net worth expenditure method of proof, expenditures alone are ultimately equated with income. Although Section 23(h) may apply where gambling income is determined by conventional proof, it does not apply in the instant case. In any event, the deficiencies determined by the Tax Court reflect the elimination of gambling losses. While the Commissioner originally determined deficiencies based upon the inclusion of such losses, he conceded in the Court below that gambling losses should not be included in non-deductible expenditures. There is nothing to show that the Tax Court did include them in that category.

Taxpayer's remaining point is that there was no sufficient proof that the deficiencies for the taxable years were due to fraud. The Tax Court found that a part of the deficiencies in tax for each of the years in question was due to fraud with intent to evade tax, and that such fraud had been proved by clear and convincing evidence.

■ The question whether taxpayer filed returns with intent to evade tax is a question of fact. The burden of proof is upon the Commissioner. The penalty imposed by Section 293(b) Internal Revenue Code of 1939 is a civil sanction and there is no burden on the Commissioner to prove his case beyond a reasonable doubt. Helvering v. Mitchell, 303 U.S. 391, 403, 58 S.Ct. 630, 82 L.Ed. 917. The Tax Court's finding on the issue of fraud is entitled to finality unless it is clearly erroneous. Goldberg v. Commissioner of Internal Revenue, 7 Cir., 100 F.2d 601; Section 7482 Internal Revenue Code of 1954. Discrepancies between real and reported income for a number of years alone is strong evidence of an attempt to evade. Hargis v. Godwin, 8 Cir., 221 F.2d 486, 490. We hold the Tax Court's finding that a part of the deficiencies was due to fraud with intent to evade tax has substantial support in the record and should not be disturbed upon appeal. Helvering v. Kehoe, 309 U.S. 277, 60 S.Ct. 549, 84 L.Ed. 751; Humphreys v. Commissioner of Internal Revenue, 7 Cir., 125 F.2d 340; Goldberg v. Commissioner of Internal Revenue, 7 Cir., 100 F.2d 601.

The principal difference between the computation of the Commissioner and the Tax Court is that the Commissioner found that at the commencement of the net worth period taxpayer had in his possession only $15.03 in cash, while the Tax Court determined that $100,000 was the correct figure. The computation used by the Tax Court appears to be correct. We cannot say that any of its findings are clearly erroneous. The decision of the Tax Court is

Affirmed.